**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KENYATTA C. ROGERS,    CASE NO. 4:18-cv-10561

   *Plaintiff*,     DISTRICT JUDGE MATTHEW F. LEITMAN
*v.*        MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs.  14, 15)**

## I.  RECOMMENDATION

In light of the entire record in this case, I conclude that substantial evidence does

not support the Commissioner's denial of benefits. Therefore, I recommend **GRANTING**

Plaintiff's Motion, (Doc. 14), **DENYING** the Commissioner's Motion, (Doc. 15), and

**REMANDING** to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## II.  REPORT

### A.  Introduction and Procedural History[1]

Plaintiff applied for Title II Disability Insurance Benefits (DIB) and for Title XVI

Supplemental Security Income (SSI) on January 23, 2015, alleging she became disabled

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case
was referred to the undersigned Magistrate Judge to review the final decision of the Commissioner denying
Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income. (R. 3.)

on September 16, 2014. (R. 11, PageID.188-197.)[2] The Commissioner denied the claims. (R. 11, PageID.123-124.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which occurred on December 6, 2016. (R. 11, PageID.64-95, 135.) The ALJ issued a decision on May 1, 2017, finding Plaintiff was not disabled during the relevant period. (R. 11, PageID.42-55.) On December 22, 2017, the Appeals Council denied review. (R. 11, PageID.33-35.)

Plaintiff sought judicial review on February 16, 2018. (R. 1). She then filed the instant Motion for Summary Judgment on June 27, 2018, (R. 14), and the Commissioner countered with its own Motion a month later, (R. 15). Plaintiff has replied, (R. 16), and the case is now ready for resolution.

### B.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you

---

[2] The application date given in the ALJ's decision and Defendant's brief is October 8, 2014. (R. 11, PageID.42; R. 15, PageID.588-589.) However, the actual applications, and Plaintiff's brief, show January 23, 2015 as the date. (R. 11, PageID.188, 192; R. 14, PageID.563.) The discrepancy does not affect the outcome.

2

are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

C.     **ALJ Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 11, PageID.42-55.) At step one, the ALJ found that the last date Plaintiff could claim insurance for (i.e., the last date of insured status) was December 31, 2018. (R. 11, PageID.44.) Plaintiff had not worked since her alleged onset date. (*Id.*) At step two, the ALJ concluded that Plaintiff had the following severe impairments: left knee meniscus tear, articular cartilage defect of the patella, baker's cyst, degenerative arthritis of the right foot, obesity, and major depressive disorder with adjustment disorder. (*Id.*) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (R. 11, PageID.45-46.) Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently push, pull or operate foot controls with the lower extremities. She can occasionally kneel, crouch, stoop, balance, and crawl. She can occasionally climb stairs and ramps. She cannot climb ladders, ropes, or scaffolds. She can never be exposed to vibrations, unprotected heights, and moving machinery parts. She can understand and remember simple instructions. She can make simple work related decisions. She can carry out

4

simple instructions. She can occasionally deal with supervisors, coworkers, and the public.

(R. 11, PageID.46.) At step four, the ALJ found that Plaintiff could not perform her past relevant work. (R. 11, PageID.49.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (R. 11, PageID.50-51.)

### D.    Administrative Record

#### 1.    Medical Evidence

In July 2014, Plaintiff sought emergency-room treatment for right-foot pain. (R. 11, PageID.332.) Her examination results were largely normal—her mood and affect were normal, she was alert, and she had normal range of motion throughout her musculoskeletal system. (*Id.*) Her right foot was tender, but there was no redness, swelling, or discoloration, and her toes' ranges of motion were normal. (*Id.*) X-rays showed "soft tissue swelling and degenerative changes with no evidence of acute bony process." (*Id.*) The physician believed that her foot was sprained or strained, likely due to Plaintiff's morbid obesity. (*Id.*) She was given Motrin, told to rest her foot, placed in a post-operation shoe for stability, and given crutches because she had pain when walking. (*Id.*)

On September 12, 2014, Plaintiff fell on a wet floor while shopping and went to the emergency room due to left-knee injuries. (R. 11, PageID.320.) On examination, she was normal except for her left knee, which exhibited pain with movement but no laxity or bony deformities. (R. 11, PageID.321.) Imaging revealed moderate tricompartmental osteoarthritis, but no fracture or acute changes. (R. 11, PageID.322.) Her left meniscus was

torn. (R. 11, PageID.325.) Her knee was placed in an immobilizer and she was given medications, diagnosed with acute left knee contusion and arthritis, and discharged with the suggestion that she follow up with a physician. ((R. 11, PageID.322.)

Plaintiff's main healthcare provider was nurse practitioner Barbara Kish. The records from their treatments begin in early 2014, before Plaintiff's complaints of foot and knee pain. (R. 11, PageID.380.) In the records prior to the emergency room visits, her examination results were generally normal, although they did not include findings regarding her musculoskeletal system. *See, e.g.*, (R. 11, PageID.377-378, 382.)

Regarding her mental status, in February 2014 Kish noted that Plaintiff had intact judgment and memory, as well as proper orientation; she did not have depression, anxiety or agitation. (R. 11, PageID.382.) A few months later, in May, she provided the following responses to a depression assessment focusing on the prior two weeks: more than half the time she felt depressed and had little interest in doing things; on several days she felt tired and had appetite troubles; but she denied difficulties with sleeping, feeling "bad" about herself, trouble concentrating, moving or speaking too slowly or quickly, or difficulty with work, homecare, or getting along with others. (R. 11, PageID.375.) No diagnosis was rendered, and the notes rated "Depression Severity" as mild. (*Id.*) At the same examination, however, the notes indicate that she was not suffering from depression, anxiety, or agitation, and that her mental status findings were normal. (R. 11, PageID.378.)

On July 16, 2014, Kish's notes state that Plaintiff had recently been seen in the emergency room for occasional right foot pain. (R. 11, PageID.371.) Plaintiff rated the pain as moderate (a three out of five on a visual analog scale). (*Id.*) Her physical and mental

6

examination notes do not flag abnormalities, except they mention tenderness in her foot, flat feet, and that Plaintiff was still wearing a post-operative shoe on her right. (R. 11, PageID.372.) The treatment plan for the pain was for her to look for "wider based supportive shoes" and "heel/arch supports as able to obtain," and take Ibuprofen. (R. 11, PageID.373.)

Her next visit with Kish came shortly after her fall in September 2014. (R. 11, PageID.367.) Plaintiff informed Kish that the pain had persisted for years, that she had "an old tear," and "she was told she needed a knee replacement." (*Id.*) She was "unable to work with this level of pain," which she rated as four out of five. (*Id.*) The physical examination notes state that Plaintiff's left knee had "mild effusion," warmth and crepitus, reduced strength (at two out of five), "Lateral Lig instability," and minimal range of motion. (R. 11, PageID.369.) Plaintiff was given pain medication and an "off from work" note. (*Id.*)

The following month, Plaintiff reported to Kish that she had remained off work. (R. 11, PageID.362.) Her knee pain—still at a four out of five—had caused depression, and she was "interested in starting something" for that. (*Id.*) Kish diagnosed depression. (R. 11, PageID.365.) Plaintiff currently wore an adjustable knee brace, which Kish advised she wear eight to ten hours a day. (R. 11, PageID.362, 365.) The examination of Plaintiff's left knee produced results identical to the prior visit's. (R. 11, PageID.364-365.)

In December 2014, Plaintiff reported continuing pain in her right foot, which she had endured for two years and made it difficult to bear weight. (R. 11, PageID.357.) The foot pain was now at three out of five. (*Id.*) On examination, her left knee was unchanged and her fight foot was tender. (R. 11, PageID.359.) Mentally, she had no difficulties and

7

the notes indicate she was not suffering from "depression, anxiety, or agitation." (R. 11, PageID.360.) Kish prescribed a cane, along with pain medications. (*Id.*)

In February 2015, Dr. Colleen Linehan ordered an MRI of Plaintiff's right foot. (R. 11, PageID.457.) Among other things, the MRI showed mild degenerative changes. (*Id.*)

In March 2015, Plaintiff was seen at Dr. Linehan's office. (R. 11, PageID.459.)[3] The pain in her right foot was intense, registering at ten out of ten on a visual analog scale. (*Id.*) An injection in December 2014 helped, providing relief that lasted into February 2015. (*Id.*) The examination of the right and left knees was largely normal, each having flexion of 120 degrees, no edema, no effusion, and some tenderness. (R. 11, PageID.459-460.) The diagnosis was for a knee brace, a short boot, and Supartz injections. (R. 11, PageID.460.)

At an annual checkup with Kish in March 2015, Plaintiff stated that she could not perform her own chores. (R. 11, PageID.444.) She also reported taking Celexa for anxiety. (R. 11, PageID.445.) Her foot pain remained at three out of five. (*Id.*) Although the physical examination did not specifically address Plaintiff's knee and foot, the overall results were normal (for present purposes), including Plaintiff's mental status, the notes for which indicated "no depression, anxiety, or agitation at this time." (R. 11, PageID.447-448.)

In May she requested that Kish fill out a "chore care provider" form because she struggled with housework and needed assistance. (R. 11, PageID.516.) Regarding her depression, she noted that Wellbutrin was not working and that she was not in counseling. (*Id.*) Her pain was at four out of five. (R. 11, PageID.517.) But the mental status

---

[3] It appears that a physician's assistant produced the notes and treatment plan, but the report states that Dr. Linehan examined the patient and agreed with the plan. (R. 11, PageID.460.)

examination section of the treatment notes states that Plaintiff had "no depression, anxiety, or agitation," and the rest of the findings were normal. (R. 11, PageID.519.)  Her left knee had full extension, minimal effusion, flexion of 90 degrees, and no ligament instability. (*Id.*)

Later the same month she visited Kish to discuss weight loss. (R. 11, PageID.436.) The examination results were normal—Plaintiff's left knee had no erythema, swelling, or unnatural warmth, the knee's flexion was at 120 degrees, and, mentally, Plaintiff was normal and experienced no depression or anxiety. (R. 11, PageID.438-439.) Plaintiff did not want bariatric surgery unless necessary, preferring to see a nutritionist. (R. 11, PageID.440.)

Plaintiff received a psychiatric evaluation by Dr. Donovan Royal in May 2015 as part of her application for disability benefits. (R. 11, PageID.395.) At the appointment, Plaintiff told Dr. Royal she had been depressed since falling on the job in 2008 and again in 2014 while shopping. (*Id.*) She had never, however, received psychiatric treatment. (*Id.*) In high school, she had graduated "with a diploma in both special education and regular education classes." (*Id.*) Since January 2015, she had been off work. (*Id.*) She would like to work and felt that her former employer could have found something else she was capable of, "but her physical injuries and immobility appear to have made that unlikely." (R. 11, PageID.395.) Her relationships with her children and her mother were close, but she generally did not like being around people. (R. 11, PageID.396.) On a typical day, she got her children ready for school, took a nap, ate lunch, and watched television. (*Id.*) She also

liked to journal. (*Id.*) She could not bathe in a tub, having to sit on the side of it while washing. (*Id.*) A "chore provider" came daily. (*Id.*) Insomnia disrupted her sleep. (*Id.*)

During the interview with Dr. Royal, Plaintiff was cooperative, attentive, polite, friendly, affable, and well organized, "but frequently tearful" and complained of pain. (*Id.*) Dr. Royal observed that she wore a leg brace, used a cane, and limped; she reported using crutches as well. (*Id.*) She did not seem to exaggerate or minimize her symptoms, her insight was reliable, her thoughts were logical and well organized, and she had normal speech, depressed mood, and proper orientation. (R. 11, PageID.396-397.) Dr. Royal diagnosed depression and anxiety. (R. 11, PageID.398.) Celexa did not appear to help, and "her prognosis for improved psychological and adaptive functioning and employment appear poor. It is recommended that she be reevaluated for medication adjustment." (*Id.*)

In May 2015, Plaintiff's foot and knee problems were evaluated by Dr. Siva Sankaran. (R. 11, PageID.401.) Normally, she used a brace and a cane—with the brace she could walk up to a block. (*Id.*)[4] Although she was "too young to have surgery," she was trying every other method of treatment short of surgery. (*Id.*)  For example, she had a cortisone shot in September 2014 and was currently undergoing physical therapy. (*Id.*) The State of Michigan gave her a chore provider "because she has three children at home." (*Id.*) And Plaintiff "does not do any work at home because the chore provider is available." (R. 11, PageID.402.)

---

[4] The notes state both that she said she sometimes used crutches and that she did not use them. (R. 11, PageID.401-402.)

Dr. Sankaran's physical examination of Plaintiff revealed the following. (R. 11, PageID.403.) When not using her cane or knee brace, she could walk with a limp. (*Id.*) Additionally,

> [s]he is able to touch her toes but unable to squat complaining of left knee pain. . . . No edema of feet. No cyanosis or clubbing present. Her left knee is painful, swollen and tender with decreased range of motion. Grating sensation is felt in the left knee. The right foot is tender on the dorsal aspect and lateral aspect without obvious swelling or deformity. . . . Straight-leg raising test is negative bilaterally. Her hand grip is 45 pounds bilaterally. . . . She is able to open a jar, button clothing, write legibly, pick up a coin and tie shoelaces with either hand.

(*Id.*) There followed pages of supplemental reports indicating various abilities and test results. (R. 11, PageID.407) Of note, Dr. Sankaran concluded that plaintiff's "Current Abilities" included all the abilities listed, such as siting, standing, bending, stooping, carrying, pushing, pulling, climbing stairs, squatting, rising from a squatting position, making a fist, writing, dressing and undressing, and climbing on and off the examining table. (R. 11, PageID.404.) Regarding the supplemental test results, Plaintiff was almost uniformly normal, including left and right knee flexion ranges; she lacked, however, stable gait. (R. 11, PageID.404-407.) Dr. Sankaran concluded that she did not need a walking aid. (R. 11, PageID.405.)

In May 2015, Dr. Robert Newhouse reviewed the record for the Commissioner. (R. 11, PageID.103.) He found mild restrictions in daily activities and moderate difficulties in social functioning, concentration, persistence, and pace. (R. 11, PageID.102.) Regarding Plaintiff's mental status, he concluded that she was not significantly limited in the following abilities: carrying out very short and simple instructions; sustaining ordinary

routines without special supervision; working with others without distraction; making simple work-related decisions; and in her abilities related to social interactions and adaptations. (R. 11, PageID.106-107.) She had moderate limitations in concentrating for long periods, performing activities within a schedule, carrying out detailed instructions, completing a workday without interruption, and maintaining a consistent pace. (R. 11, PageID.106.) Dr. Newhouse explained that he discredited Plaintiff's complaints regarding her depression because despite claiming to prefer being alone, she enjoyed her work, got along well with her children, attended church, cared for her children, shopped, handled money, and seemed "independent in personal care." (R. 11, PageID.107.)

At an appointment with Kish in July 2015, the notes mention Plaintiff's conditions, but Plaintiff apparently denied experiencing pain presently. (R. 11, PageID.434.) Her gait, however, was slow, and her right foot was tender with motion; her left knee had full extension, no ligament instability, some decreased flexion, and minimal patellar effusion. (R. 11, PageID.435.) Her knee and gait were the same four months later when she saw Kish again. (R. 11, PageID.431.) This time, however, she reported moderate pain in her left knee. (R. 11, PageID.429.) No depression or abnormalities were found in the mental status examination. (R. 11, PageID.431.)

She saw Kish in February 2016 for ear pain. (R. 11, PageID.523.) During the medical examination, her musculoskeletal and psychiatric results were normal; in particular, the report states that she "[m]ove[d] all extremities equally. Normal structure, tone, and strength. Full ROM [i.e., range of motion]." (R. 11, PageID.525.)

Plaintiff reported no present pain at a session with Kish in August 2016. (R. 11, PageID.514.) She said that a doctor had told her that surgery for the knee was impossible until she lost weight. (R. 11, PageID.513.)[5] Her left knee had full extension, minimal effusion, flexion of 90 degrees, and no ligament instability. (R. 11, PageID.515.)

The renewed pain had ceased by her next appointment with Kish, in November 2015. (R. 11, PageID.408-409.) She now complained of arm and leg weakness. (R. 11, PageID.408.) While her gait was slow, she had normal strength and range in her right leg (and in both arms), and her left knee had full extension, minimal patellar effusion, some decreased flexion, and no ligament instability. (R. 11, PageID.411.) Her mental status examination was again normal, with no depression or anxiety. (*Id.*)

In September 2015, Plaintiff filled out an intake form for counselling with Sherrhonda Brown. (R. 11, PageID.466-468.) Plaintiff complained of depression, anxiety, sadness, anger, social withdrawal, and sleep problems. (R. 11, PageID.466.) These conditions had persisted since 2014. (*Id.*) But Plaintiff denied any history of physical problems. (*Id.*) She had close relationships with all three of her children. (R. 11, PageID.467.) She lived alone with the children. (R. 11, PageID.468.) Her educational history included special education, and she stated she was diagnosed with a learning disability. (*Id.*) She had problems with reading and writing, but she knew enough to get by. (*Id.*) She had never received mental health counseling. (*Id.*) A year later, she filled out an

---

[5] Plaintiff later told a dietician that she needed to lose weight before she could have surgery. (R. 11, PageID.543.)

identical form. (R. 11, PageID.473.)[6] She no longer indicated sleep problems, but now had nightmares and hearing, learning, and speech problems. (R. 11, PageID.473, 475.)

Plaintiff saw Brown, the counselor, in September 2015. (R. 11, PageID.477.) Rating her depression over the past two weeks, Plaintiff stated the following: on several days, she had little interest in "doing things," had issues with eating, felt bad about herself; nearly every day, she felt depressed, had troubles with sleep, struggled with concentration; and she found work and household chores very difficult. (*Id.*) These answers indicated a moderately severe depression. (*Id.*) Brown observed that Plaintiff had good rapport, had appropriate mood and behavior and memory, and displayed organized thinking. (R. 11, PageID.480.) Plaintiff was to follow up with a therapist. (R. 11, PageID.477-478.)

The next reported session with Brown, however, was not until a year later. (R. 11, PageID.482.) The complaints remained largely the same. (*Id.*) The rapport this time was fair, but Plaintiff's behavior, judgment, and orientation were normal, and her thinking was organized. (R. 11, PageID.484.) Brown also noted that Plaintiff's intelligence was below average, (*id.*); a year before, Brown had wanted more assessment, (R. 11, PageID.480). Nothing in the record, however, indicates that Brown's new assessment was supported by additional testing or assessment.

Plaintiff saw Dr. Pervez Yusaf in October 2015, for left knee pain. (R. 11, PageID.464.) The examination revealed "some swelling" and tenderness. (R. 11, PageID.465.) Based on this, and MRIs, Dr. Yusaf diagnosed severe degenerative arthritis

---

[6] There is no signature on this form. (R. 11, PageID.475.)

14

with genu valgum (knock knee). (*Id.*) Dr. Yusaf's conclusion on treatment was that

Plaintiff

> is very young and has a very severe problem that is obesity plus arthritis of the left knee. It is possible she has arthritis in other joints in the body. The best thing for her would be to have bariatric surgery so that this weight can be controlled and that will help her pain and help any other procedures which she needs in the future. . . . At the moment, I cannot do anything for this patient. I told her to continue using her cane.

(*Id.*)

In December 2016, Plaintiff again saw Kish. (R. 11, PageID.506.) Her knee pain

was at four out of five. (R. 11, PageID.507.) Her gait was slow, her left knee flexion limited

to 90 degrees, she had minimal patellar effusion in her left knee, and the knee had full

extension. (R. 11, PageID.509.) Her mental status examination was normal and she was

not depressed or anxious. (*Id.*)

Kish filled out a medical source opinion form in March 2017. (R. 11, PageID.550.)

In it, Kish estimated that Plaintiff could lift and carry about 10 pounds, "stand and/or walk"

for 20 minutes without interruption and for 1 hour in an 8-hour workday, and sit for 30

minutes without interruption. (*Id.*) She could occasionally reach, handle, push, or pull; and

never climb, balance, stoop, crouch, kneel, crawl, or bend. (R. 11, PageID.551.) Further,

Plaintiff had various environmental restrictions, including heights, moving heights, and

temperature extremes. (*Id.*) The impairments would affect Plaintiff's concentration and she

would also need several unscheduled breaks during a workday. (R. 11, PageID.552.)

During a typical month, she would miss more than half the workdays. (*Id.*) The portion of

the form asking for Plaintiff's diagnoses was left blank, and in the section for the prognosis,

15

Kish wrote, "Fair—see Pt summary for list of medical conditions." (*Id.*) Kish also failed to answer the final question asking whether Plaintiff was disabled from full-time work. (*Id.*)

Also contained in the record are papers from Plaintiff's last year of high school, in 2003. (R. 11, PageID.219.) The reports show that she struggled in regular education classes and attended some special education programming. (R. 11, PageID.221.) Nonetheless, she was on the regular diploma program, not the special education alternative, and she hoped to attend a two-year college. (R. 11, PageID.222.) She was also enrolled in a work-study program at a daycare. (*Id.*) Her reading and writing were at the third-grade level, according to the school records. (R. 11, PageID.225-226.) But the assessment concluded that the achievement levels were discordant with her intellectual ability, and they did not result from visual or hearing handicap, mental retardation, or emotional disturbance. (R. 11, PageID.228.) A report from the special education teacher states that Plaintiff was making good progress in reading and writing, but was slowly progressing in math. (R. 11, PageID.229.) The records also indicate that Plaintiff's "legs bother her." (R. 11, PageID.232.)

A subsequent special education report states that Plaintiff was eligible for the program because she had a specific learning disability (which was unnamed). (R. 11, PageID.325.) Apparently, this conclusion stemmed from an assessment by the school psychologist. (R. 11, PageID.236.) The assessment report indicated that Plaintiff behaved appropriately and had normal physical activity. (*Id.*) A litany of tests showed that Plaintiff's intellectual ability was at the low-average range, her vocabulary was borderline, and her matrices solving ability was average; her reading skills had increased to the fourth-grade

16

level in many respects, and her writing and math had improved as well. (R. 11, PageID.238.)

### 2.    Application Reports

Plaintiff completed an adult function form on March 1, 2015. (R. 11, PageID.256-263.) Her main problems were constant pain in her left leg and right foot; she needed surgery on both, she claimed. (R. 11, PageID.256.) She took care of her young children, but she added that she "basically just . . . talk[ed] to my kids and they help me too," and she had assistance with their care. (R. 11, PageID.257.) Her conditions affected her ability to dress because she had trouble bending, her bathing because she had to sit on the side of the tub, and her use of the toilet because she needed a higher seat. (*Id.*) But she did not indicate any problems with hair care, shaving, or eating. (*Id.*) She prepared meals by microwave. (R. 11, PageID.258.) She could drive, ride in a car, and leave the house unassisted to shop and attend appointments. (R. 11, PageID.259.) Finances, such as paying bills and managing a savings account, presented no obstacles for her. (*Id.*) Hobbies and recreational interests had diminished, and her depression affected her social life. (R. 11, PageID.260.) Chores were unbearable. (R. 11, PageID.258) Confusion often arose when she had to run errands and she frequently needed someone to accompany her. (*Id.*)

Her conditions affected her memory and numerous other abilities: lifting, squatting, standing, bending, reaching, walking, sitting, kneeling, climbing stairs, concentrating, and interacting with others. (R. 11, PageID.261.) The longest she could walk without resting was a few feet (*Id.*) Anxiety attacks would take her off task. (*Id.*) She followed spoken

instructions "ok," and did not get along with authority figures. (R. 11, PageID.261-262.) On the form, she marked that she used a cane, but not a brace. (R. 11, PageID.262.)

### 3.    Administrative Hearing

The hearing was held in April 2017. (R. 11, PageID.64.) Plaintiff's testimony began by recounting her prior work. (R. 11, PageID.67-68.) Plaintiff then testified that her knee swelled and ached. (R. 11, PageID.74.) The pain was constant. (*Id.*) The swelling varied with her activity—on days she walked more, it would swell. (R. 11, PageID.75.) She needed to have it extended, even when sitting, because bending it was too painful. (R. 11, PageID.74.) A cane helped her walk and stand. (R. 11, PageID.75.) Her knee, which was weak, also crackled and popped. (*Id.*) At most, she could stand for two minutes and walk a block. (R. 11, PageID.76.) Sitting, too, proved difficult, requiring almost constant adjustments and after only five minutes or so she had to rise or lay down. (*Id.*) Her knee brace did not help. (R. 11, PageID.77.) Every day—usually every time she sat—she elevated her leg. (*Id.*) The first knee injection had helped, but the subsequent ones had seemed to make it worse. (R. 11, PageID.78.) The surgeon she visited told her that she needed to lose weight to get the surgery. (R. 11, PageID.78-79.)

As for her right foot, at times it seemed normal, while at others the stabbing pain prevented her from walking at all. (R. 11, PageID.79.) But the pain occurred every day and forced her to "walk[] on my tippy toes if I don't have a boot or something on." (*Id.*) The pain medication similarly failed to give much relief. (R. 11, PageID.80.) She would also elevate her foot. (*Id.*)

18

Plaintiff then testified that she had attended special education classes in school and had only basic level reading skills. (*Id.*) In her prior jobs, she had sometimes needed help understanding instructions. (R. 11, PageID.81.)

These problems had led to depression. (*Id.*) What depressed her, she stated, was that she no longer could do daily activities such as wash dishes, cook, or play with her children. (R. 11, PageID.81-82.) When she attempted to wash dishes, for example, she needed multiple breaks. (R. 11, PageID.82.) Even watching television was difficult because she needed to walk around frequently throughout a show; if she could, she would pause the episode, but a show on regular programming that could not be paused was impossible to watch in its entirety. (R. 11, PageID.83.) She also found herself avoiding people more frequently. (R. 11, PageID.82.) Sleeping was difficult. (R. 11, PageID.83-84.) A chore provider did the housework and assisted with the children. (R. 11, PageID.84.)

The ALJ then asked the VE to consider the following hypothetical individual

of the claimant's age, education, and work experience [who] can perform work at the light exertional level except the individual can frequently push or pull or operate foot controls with the lower extremities.

Assume that the individual can occasionally kneel, crouch, stoop, balance, and crawl; can occasionally climb stairs and ramps; can never climb ladders, ropes, and scaffolds; and can never be exposed to vibrations, unprotected heights, and moving machinery parts.

Also, assume that the individual is able to understand and remember simple instructions; make simple work-related decisions; carry out simple instructions; and can occasionally deal with supervisors and coworkers and the public.

(R. 11, PageID.89.) Such an individual could not complete any of Plaintiff's past work, the VE testified. (*Id.*) But the individual could perform other work: housekeeper (900,000

positions nationally); merchandise marker (1.5 million positions nationally); inspector and hand packager (450,000 positions nationally). (R. 11, PageID.89-90.)

The ALJ then added the following limitations to his first hypothetical: the individual needed to alternate sitting, standing, and walking every 30 minutes; use a cane; and be off task 5 percent of the day. (R. 11, PageID.90-91.) The cane, but not the off-task time, would preclude work, the VE concluded. (R. 11, PageID.91.)

Next, the ALJ posed a third hypothetical:

> [A]ssume an individual of the claimant's age, education, and work experience can perform work at the sedentary exertional level except the individual must be allowed to alternate between standing or walking and sitting every 15 minutes. The individual can occasionally push or pull or operate foot controls with the lower extremities and can occasionally push or pull or operate hand controls with the upper extremities.

> Assume that the individual can never kneel, crouch, stoop, balance, and crawl; can occasionally climb stairs and ramps; can never climb ladders, ropes, and scaffolds; and can never be exposed to vibrations, unprotected heights, and moving machinery parts.

> Also, assume that the individual is able to understand and remember simple instructions; make simple work-related decisions; carry out simple instructions; and can occasionally deal with supervisors, coworkers, and the public.

> Finally, assume that the individual would be required to take additional breaks beyond the normal scheduled breaks and be off task 15 percent of a workday and would be absent from work three or more days per month.

(R. 11, PageID.82.) There were no jobs such an individual could perform, the VE testified. (*Id.*) Missing three days per month and alternating positions every 15 minutes would make work difficult, particularly if the person was limited to occasional public interaction. (R. 11, PageID.92-93.)

## E.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[7] carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513, 416.913 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an

---

[7] Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. §§ 404.1527(c), 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also*

22

*Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, or the application of vocational factors. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[8] Credibility determinations regarding a claimant's subjective complaints rest with

---

[8] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has

the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v.

Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996

WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

confirming that objective medical evidence of the underlying condition exists. The ALJ

then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v.

Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the

extent of the work-related limitations by determining the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of

Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's

description of his or her physical or mental impairments will "not alone establish that [he

---

remained materially unchanged, *see* 20. C.F.R. §§ 404.1529(c), 416.929(c), and I agree with the courts in
this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper
v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. &
Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-
11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125
(E.D. Mich. July 7, 2017).

or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### F.      Arguments and Analysis

Plaintiff makes three arguments. First, she contends that the ALJ erred by not analyzing Kish's opinion. Second, she argues the ALJ's decision lacks substantial evidence. Third, she states that the ALJ erred by relying on the VE's testimony when that testimony was inconsistent with the RFC. For the reasons that follow, I find the first two arguments, which partially overlap, persuasive and recommend remanding the case accordingly. I do not find the third argument compelling, however, and do not recommend remand on that basis.

1.    **Kish's "Other Source" Opinion**

a.    **Parties' Arguments**

Plaintiff first argues that the ALJ botched the analysis of the treating healthcare provider, nurse Kish. (R 14, PageID.572.) She notes that Kish ordered her to stop working after the accident due to pain. (*Id.*) Kish's notes reported that Plaintiff used a chore provider for help around the house. (R 14, PageID.573.) The notes also reported obesity, pain, and reduced functioning. (*Id.*) After providing treatment for over two years, Kish completed a medical source statement that included disabling limitations. (R 14, PageID.574.)

Plaintiff's argument describes some of the evidence relating to Kish and reports the ALJ's RFC and decision to give Kish little weight. (R 14, PageID.574-575.) She then concludes that the ALJ erred by failing to provide a rationale for discounting Kish's opinion. (*Id.*)

Defendant responds by noting that Kish is a non-acceptable "other" medical source who gave no basis for her opinion. (R. 15, PageID.594.) The ALJ was under no obligation to explain why he discounted a non-acceptable medical source. (R. 15, PageID.595.)[9] Even if that were error, Defendant continues, it was harmless because Kish's opinion offered no explanation or support for its conclusions and thus was patently deficient. (R. 15, PageID.595-596.) Not even the underlying diagnoses appear in the opinion. (R. 15,

---

[9] Plaintiff replies that the Defendant is mistaken. (R. 16, PageID.611.) Citing SSR 06-3p and *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532 (6th Cir. 2007), Plaintiff argues that ALJs must explain the weight given to "other sources" such as Kish. (R. 16, PageID.611.)

PageID.596.)[10] If the opinion were somehow not deemed patently deficient, Defendant argues that the ALJ nonetheless relied on substantial evidence to support his decision. (*Id.*) This evidence includes the conservative treatment, the generally normal physical examinations, and the consultative examiner's report. (*Id.*) The report directly contradicts Kish's opinion and, as such, sheds light on the ALJ's reasons for giving the opinion little weight. (R. 15, PageID.596-597.)

### b. Analysis

To resolve the first issue, the Court must ask what analysis Kish's opinion was owed, whether the ALJ engaged the analysis satisfactorily, and, if not, whether the failure was harmless. The analysis begins by classifying Kish, a nurse practitioner, within the Commissioner's medical source framework. The regulation explicitly gives the answer: nurse practitioners are "other sources," not acceptable sources. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (2016); *see also Keillor v. Comm'r of Soc. Sec.*, No. 15-cv-11762, at *3 (E.D. Mich. Aug. 8, 2016) (noting that nurse practitioners are "other sources" and their opinions are not entitled to any particular weight), *rep. & rec. adopted by* 2016 WL 4720375 (E.D. Mich. Sept. 9, 2016).

The next issue is how the ALJ must analyze an "other source" opinion. As noted above, opinions from acceptable medical opinions undergo a six-factor analysis. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). The regulations do not prescribe any similar test for "other source" opinions, leaving ALJs without an explicit framework for analyzing

---

[10] In reply, Plaintiff argues that the medical evidence supporting Kish's opinion comes in the treatment notes Kish provided, spanning more than 140 pages. (R. 16, PageID.612.)

27

opinions from "other sources." SSR 06–03p, 2006 WL 2329939, at *3. The agency sought to provide clarity in a 2006 Ruling by noting that ALJ's were already required to "consider" these opinions under 42 U.S.C. § 423(d)(5)(B), and suggesting that the balancing factors for "acceptable" sources "can be applied to opinion evidence from 'other sources.'" *Id.* at *2, 6. However, this pronouncement adds less clarity than it would appear at first glance.

A critical question that the Ruling acknowledges, but fails to resolve, is not how the ALJ must "consider" these opinions, but rather the extent to which the ALJ must explain these considerations in his or her opinion, or if they must be explained at all. *Id.* at *6. The Ruling states,

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* In other words, the adjudicator should either explicitly address the opinion or make certain that the general discussion is clear enough to illuminate the ALJ's analysis of the opinion. The latter option provides no assurance that the opinion will be explicitly addressed.

The district courts in this circuit have accordingly come to different conclusions on whether an ALJ must explicitly address "other source" opinions in the decision. *See, e.g.*, *Russell v. Comm'r of Soc. Sec.*, No. 1:13–CV–291, 2014 WL 1333262, at *9 (N.D. Ohio Mar.31, 2014) ("District courts in this circuit vary in their interpretation of whether SSR 06–03p requires an ALJ to discuss the reasons for not crediting opinions from other

sources."); *Hill v. Astrue*, No. 5:12CV–00072–R, 2013 WL 3293657, at *4 (W.D. Ky. June 28, 2013) (noting that SSR 06–03p "has generated some controversy among the courts within this Circuit as to the degree of explanation required in the ALJ's written decision"), *aff'd*, 2014 WL 1257948 (6th Cir. Mar.27, 2014); *Southward v. Comm'r of Soc. Sec.*, No. 11–14208, 2012 WL 3887212, at *3 (E.D. Mich. Sept.7, 2012) ("[D]istrict courts in this circuit have varied widely in their interpretation of whether SSR 06–3p obligates an ALJ to discuss his reasons for not crediting opinions from 'other sources.'").

One group of cases relies on a close reading of the text of the regulations and the Ruling and finds that they do not include an explicit requirement to discuss "other source" opinions. *Sanders v. Comm'r of Soc. Sec.*, No. 16-cv-13952, 2018 WL 2181096, at *5 (E.D. Mich. Jan. 23, 2018) ("Accordingly, the ALJ was under no obligation to explain the weight that she assigned to Ms. Boyd's [a nurse practitioner's] opinion . . . ."); *rep. & rec. adopted by* 2018 WL 1531595, at *2 (E.D. Mich. Mar. 29, 2018) ("First of all, the Magistrate Judge correctly points out, and Plaintiff does not dispute, that SSR 06-03p 'is phrased in permissive rather than mandatory terms,' and that the ALJ therefore 'was under no obligation to explain the weight that she assigned to Ms. Boyd's opinion or give good reasons for discounting' this opinion."); *Boyer v. Comm'r of Soc. Sec.*, No. 1:12–cv–03088, 2013 WL 6568768, at *17 (N.D. Ohio Dec. 13, 2013) ("SSR 06–03p does not include 'an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from "other sources."'" (quoting *Chambers v. Astrue*, 835 F.Supp.2d 668, 678 (S.D. Ind. 2011))); *Southward v. Comm'r of Soc. Sec.*, No 11–CV–14208, 2012 WL 3887439, at *6 (E.D. Mich. May 17,

2012) ("[T]he ALJ is not required to explain the weight given [an other source] opinion nor is the ALJ required to give reasons why her opinion was discounted."), *rep. & rec. adopted by* 2012 WL 3887212 (E.D. Mich. Sept.7, 2012); *Hickox v. Comm'r of Soc. Sec.*, No. 1:09–cv–343, 2010 WL 3385528, at *7 (W.D. Mich. Aug. 2, 2010) ("SSR 06–3p does not require that an ALJ discuss opinions supplied by 'other sources' or to explain the evidentiary weight assigned thereto."), *rep. & rec. adopted by* 2011 WL 6000829 (W.D. Mich. Nov. 30, 2011); *Castle v. Astrue*, No. 08–137–GWU, 2009 WL 1158678, at *5 (E.D. Ky. Apr. 29, 2009) (noting that the Ruling and regulations discussing the ALJ's analysis of "other source" opinions are not phrased as imperatives and distinguishing Cruse ); *Ball v. Astrue*, No. 09–208–DLB, 2010 WL 551136, at *5 (E.D. Ky. Feb. 9, 2010) ("[T]he ALJ is not required to explain the weight given to the opinions of 'other sources,' or to give reasons why such opinion was discounted.").

Other cases come to the opposite conclusion, relying on the Sixth Circuit's opinion in *Cruse v. Commissioner of Social Security*, 502 F.3d 532, and a broader reading of the Ruling and regulations to find that the ALJ must discuss "other source" opinions. In *Cruse*, the court found that SSR 06–03p requires an ALJ to examine these opinions, but declined to apply the rule retroactively. *Id.* at 541–42. Many courts have followed suit. See *Williams v.* Colvin, No. 5:15-cv-2185, 2017 WL 1074389, at *4 (N.D. Ohio Mar. 22, 2017) ("There is no question that the ALJ violated SSR 06-03P when he failed to explain the weight he gave to Mr. Eckroad['s] opinions about plaintiff's RFC (or to even mention Mr. Eckroad)."); *Dunmore v. Colvin*, 940 F.Supp.2d. 677, 685 (S.D. Ohio 2013) ("[U]nder SSR 06–03p . . . the opinions of 'non-medical sources,' like those of 'acceptable medical

sources' must be weighed and evaluated with the criteria set forth in 20 C.F.R. § 404.1527[.]"); *Harthun v. Comm'r of Soc. Sec.*, No. 1:07–cv–595, 2008 WL 2831808, at *7 (July 21, 2008) (recommending reversal and remand for ALJ's failure to explain why "other source" opinions were rejected). The Sixth Circuit has since reiterated the reasoning used in *Cruse. Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. Mar.27, 2014) (noting that an ALJ should explain his or her assessment of "other sources"); *Cole v. Astrue*, 661 F.3d 931, 939–40 (6th Cir.2011) (finding that ALJ failed to "consider" an "other source" opinion by not mentioning it in the decision).

In light of the Sixth Circuit caselaw, an ALJ should discuss "other source" opinions, or at least provide reasoning that shows the ALJ considered the substantive elements of the opinions. However, "it will rarely be enough for the commissioner to silently 'consider' the above-mentioned factors in deciding how much weight to give to an 'other source' who has seen the claimant in the source's professional capacity." *Estep v. Comm'r of Soc. Sec.*, No. 15-CV-10329, 2016 WL 1242360, at *3 (E.D. Mich. Mar. 20, 2016).

Nonetheless, *Cruse* gives no indication that SSR 06–03p overturned the substantial body of case law classifying these opinions as less probative than "acceptable" sources, allowing an ALJ substantial discretion in the analysis, and absolving the ALJ from the need to discuss every piece of evidence in the record.

The Commissioner and many courts note that "other sources" are generally given less weight than "acceptable" sources. SSR 06–03p, 2006 WL 2329939, at * 5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an

'acceptable medical source' . . . ."); *Dunmore*, 940 F.Supp.2d. at 685 ("[T]he regulation [20 C.F.R. § 404.1513] . . . allows the ALJ to give greater weight to 'acceptable medical sources' who are recognized as more-qualified healthcare professionals."); *Strevy v. Comm'r of Soc. Sec.*, No. 1:12–cv–634, 2013 WL 5442803, at *7 (W.D. Mich. Sept.30, 2013) ("The opinions of such acceptable medical sources are entitled to greater weight than the opinion of a non-acceptable source . . . . .").

Here, the issue is whether the ALJ adequately explained his analysis of Kish's opinion. The ALJ summarized Kish's statement, then summarily rejected it: "I give little weight to the opinion of treating source Barbara Kish CFNP[.]" (R. 11, PageID.48-49.) No explicit rationale appears in the decision. Thus, the Court must determine whether the ALJ provided enough for a reviewer to track his reasoning regarding Kish.

I conclude that the ALJ failed to adequately show implicit consideration of Kish's opinion. As an initial matter, any possible implicit analysis is obscured by the ALJ's failure to cite to specific pages in Kish's treatment notes. Instead, he usually cited the entire evidentiary exhibit. *See, e.g.*, (R. 11, PageID.48.) This renders his reasoning more opaque and makes it more doubtful that the ALJ undertook such an analysis.

Turning to the factors the ALJ should have employed, the ALJ did not dwell on the nature or extent of Kish's treating relationship with Plaintiff, *see* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2), except to note in passing that Kish was a treating source. (R. 11, PageID.49.) Nor did he observe that Kish was Plaintiff's primary care provider over the course of a few years. These facts would generally lead the Commissioner to assign an opinion more weight. *See* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).

As to supportability, *see* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3), the ALJ did not assess the strengths and weaknesses of the evidence cited in the Kish's opinion, but he cannot be faulted for this because the opinion itself did not discuss any. The decision does examine Kish's treatment notes, finding that they support the ALJ's conclusion. (R. 11, PageID.47-48.) For example, he cites an appointment from December 2016 as an example of Plaintiff's "unremarkable" musculoskeletal examinations; he then cites the entire exhibit, containing many reports from Kish, for the proposition that Plaintiff "has had full extension of her left knee with minimal left sided patellar effusion, no ligament instability, and full sensation and circulation to her left foot." (R. 11, PageID.47, citing 509 and generally 451-549.) The ALJ was not wrong, overall: many sessions with Kish produced the same or similar results, sometimes finding tenderness too but other times finding no pain. (R. 11, PageID.372, 408-409, 411, 431, 434-435, 438-439, 509, 514-515, 519, 525.) A few sessions marked additional issues, like reduced strength and ligament instability. (R. 11, PageID.359, 364-365, 369.) But given the number of records supporting the ALJ's statement, his generalization is defensible.

The ALJ also cited Kish's records for evidence bearing on Plaintiff's mental status. (R. 11, PageID.48.) He noted, for example, that Plaintiff had displayed signs of depression and had scored from moderate to severe depression on assessments, but he also pointed to evidence in which she denied depression and had appropriate mental status examinations. (*Id.*) Again, his generalities lack nuance, but they nonetheless reflect some evidence from Kish: the nurse's examinations often found appropriate mental status and no depression (or

only mild depression) or anxiety. (R. 11, PageID.360, 375, 382, 411, 431, 438-439, 447-448, 509, 519.)

These aspects of the ALJ's decision relate to the supportability of Kish's opinion. Kish's notes were used to support the ALJ's decision, which found Plaintiff more capable than did Kish. Thus, it appears the ALJ implicitly determined that Kish's notes did not support her opinion. But it takes a few inferences and a mini-exegesis of the decision to reach this conclusion. And the further courts go in this direction, the greater the danger that they are impermissibly supplying reasons for the agency decision that the agency never relied on when making that decision. *See generally Hill v. Comm'r of Soc. Sec.*, No. 13-CV-15257, 2014 WL 6686789, at *23 (E.D. Mich. Nov. 26, 2014) ("Thus, the government as a litigant cannot provide, and the court cannot develop or accept, after-the-fact rationalizations for the agency decision 'that the agency had not relied on in its [disputed] decision . . . .'" (citation omitted)). This makes the ALJ's accurate but incomplete generalizations of the physical examinations more tenuous, as the failure to grapple with the contrary (albeit limited) evidence raises the possibility that the ALJ did not sufficiently consider Kish's opinion. Consequently, while the ALJ may have considered the supportability of Kish's opinion, the extent of that consideration—i.e., the consideration of contrary evidence—is not apparent.

Next, the ALJ did not directly opine on whether Kish's opinion was consistent with the record. To the extent he relied on other evidence to fashion an RFC less restrictive than Kish's, the ALJ must have thought that Kish's opinion was inconsistent with the record. In particular, the ALJ relied heavily on Dr. Sankaran's examination, which noted a limp but

no other problems. (R. 11, PageID.47-48, 403-407.) But this was the only other opinion evidence the ALJ examined that assessed physical limitations.

Unlike Kish's opinion, Dr. Sankaran's conclusions were not cast within a vocational context. That is, Kish opined on how long Plaintiff could sustain activities during a workday, which is how the regulations define the physical exertional levels that are used in the RFC. *See* 20 C.F.R. §§ 404.1567, 416.967. By contrast, Dr. Sankaran's relevant determinations were more abstract: Plaintiff had "no significant problem on clinical examination" and had the "current abilities" to sit, stand, and squat, for example. (R. 11, PageID.403-404.) It is not apparent how the ALJ compared Dr. Sankaran's findings on functional limitations—which on their face do not appear to propose any limitations—with Kish's, or how he incorporated those findings into the RFC's exertional and other limitations.

Nor did the ALJ examine the only other proposed functional limitations in the record, coming from the medical reviewer, Dr. Newhouse. The ALJ cited only the reviewer's opinion on Plaintiff's ability to sustain simple tasks. (R. 11, PageID.48, 107.) This opinion relates to Plaintiff's mental status, not her physical limitations, which Dr. Newhouse also opined on.

As such, the ALJ's consideration of whether Kish's opinion was consistent with other opinions is incomplete. This is not an insignificant issue because it resulted in the ALJ having to fashion functional limitations from the medical evidence without any guidance from medical opinions on the precise scope of the limitations. The ALJ is allowed to go it alone in this manner, as the Sixth Circuit has rejected a *per se* rule that ALJs must

35

employ supporting medical opinions when constructing the RFC. *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *see also Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017) (rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that Shepard was capable of light work"); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (noting that requiring ALJs to base the RFC on a medical opinion would be contrary to the ALJ's responsibility for the RFC). But because ALJs are laypersons, courts have been chary of letting them interpret and mold raw medical data into concrete functional limitations. *See generally Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 828 (E.D. Mich. 2017) (collecting cases).

Thus, while the ALJ could build the RFC without supporting opinions, he should do so only after analyzing those other opinions, particularly as they relate to concrete functional limitations. Here, the ALJ did not offer enough to show that he at least implicitly compared Kish's opinion to the other opinions in the record.

Finally, I cannot plausibly connect any of the ALJ's decision to the final two factors in the required analysis of Kish's opinion: specialization and "other factors." 20 C.F.R. §§ 404.1527(c)(5)-(6), 416.927(c)(5)-(6). At most, the ALJ recognized that Kish was a nurse by mentioning "Barbara Kish CFNP[.]" (R. 11, PageID.49.)

In sum, the ALJ did not explain the weight he accorded Kish's opinion and it is difficult to follow any such reasoning that might be implicit in his decision. Even where the reasoning comes closest to the surface, such as for the supportability factor, any implicit

analysis is incomplete. Consequently, I conclude that the ALJ's decision violates SSR 06-3p and *Cruse* because it does not demonstrate adequate consideration of Kish's opinion.

Whether this error requires remand turns on whether it was harmless. This is a somewhat closer question. It is true that Kish's form opinion fails to provide much explanation, which cuts against it. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) ("We have previously declined to give significant weight to rudimentary indications that lack an accompanying explanation."). Kish did not even jot down Plaintiff's diagnoses, although she referenced a list elsewhere in her notes. (R. 11, PageID.552.)

Ultimately, however, I believe remand is the better course. To the extent Kish's opinion may contain defects, it is up to the Commissioner, and not the Court, to weigh and assess the evidence. *See Cutlip*, 25 F.3d at 286. The ALJ did not do so here. Further, Kish's was the only treating source opinion in the record, and it offered the only concrete estimates of Plaintiff's residual abilities. As described above, although the ALJ made generally correct statements regarding Kish's medical records, he did not scrutinize those records for examination results contrary to his generalizations. For example, without citation, the ALJ noted that a February 2016 musculoskeletal examination produced normal results. (R. 11, PageID.47.) But he did not similarly note other sessions when the results indicated limited range of motion or reduced strength. *See, e.g.*, (R. 11, PageID.369.)

Additionally, he gave great weight to Dr. Sankaran's and Dr. Newhouse's opinions (without examining the latter's analysis of Plaintiff's physical capabilities) but offered only a short explanation why: "These opinions are consistent with the claimant's lack of

37

inpatient psychiatric hospitalizations during the relevant period, treatment observations, physical and mental status examination findings, and the claimant's daily activities discussed above." (R. 11, PageID.48.) Not only is this analysis cursory, its assertions are not entirely persuasive. I will address some of these concerns in the next section below, but here it is important to emphasize the following.

First, as I noted before, the ALJ's analysis of the physical examinations leaves something to be desired because its generalizations do not acknowledge many of the records to the contrary. Second, the lack of psychiatric hospitalizations does not speak to Plaintiff's physical capacities, even assuming it is probative evidence, *see Adams v. Berryhill*, No. 1:17cv47, 2017 WL 4349718, at *12 (N.D. Ind. Oct. 2, 2017) ("While inpatient hospitalization can be indicative of serious mental health symptoms, a lack of hospitalization does not necessarily mean that the individual's symptoms are not disabling.").

Third, the ALJ's characterization of Plaintiff's daily activities is questionable at best. He concluded, with only vague citations to three exhibits (without page cites) and "Testimony," that she "still engages in social and physical activities and can still independently complete most activities of daily living." (R. 11, PageID.48.) It is unclear what the ALJ is referring to. Earlier, he referenced her ability to drive, microwave food, shop, handle finances, design nails, and care for her children. (R. 11, PageID.45-46.) Critically, however, he overlooked the chore provider who assisted Plaintiff in daily activities, including childcare. (R. 11, PageID.396, 401, 516.) The fact that the Plaintiff was provided help with chores, apparently from the State of Michigan, is at least relevant

38

in assessing her daily activities. I will address this issue in greater depth in the next section, but it is enough here to conclude that Plaintiff's ability to handle daily activities is not a compelling argument for crediting Dr. Sankaran.

For these reasons, the ALJ's analysis of the other opinions in the record is not persuasive. Thus, Kish's opinion, when properly analyzed, might have a significant effect on the outcome.

In addition to these considerations, it is also noteworthy that the ALJ does not mention Dr. Yusaf's conclusion that Plaintiff had "a very severe problem." (R. 11, PageID.465.) This conclusion is almost the opposite of Dr. Sankaran's, and each came after an examination. Instead of examining Dr. Yusaf's report, the ALJ relied on his own interpretation of the raw medical data, emphasizing that the imaging studies reported only mild degenerative changes in her knee and moderate edema. (R. 11, PageID.47.) It is well settled, however, that ALJs should resist the urge to pore through the data without expert guidance. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong."). Carolyn A. Kubitschek & Jon C. Dubin, *Soc. Sec. Disability Law & Proc. In Fed. Cts.*, § 6:24 (April 2018) ("One error which ALJs frequently make is to reach their own medical conclusions about the evidence. ALJs, as lay people, are not permitted to substitute their own opinions

for opinions of physicians.").

These considerations lead me to conclude that the ALJ's error cannot be written off as harmless.

### 2.    Substantial Evidence

#### a.    Parties' Arguments

Plaintiff's second argument is that no medical evidence supports the RFC. (R 14, PageID.576.) The ALJ relied on Plaintiff's ability to function independently in daily activities, but Plaintiff contends the record shows the opposite. (*Id.*) She took frequent breaks when attempting household tasks and generally needed a chore provider. (R 14, PageID.576-577.) The ALJ's purported reliance on Dr. Sankaran, the consultative examiner, was also a mistake. (R 14, PageID.577.) "A full reading" of his findings, which include evidence of pain and a limp, does not suggest she had "full current capabilities," which is how the ALJ characterized the findings. (R 14, PageID.577-578.) Further, Plaintiff had a limp and was prescribed a cane, yet the RFC does not account for the cane or offer any explanation on the matter. (R 14, PageID.578.)

As for the ALJ's statement that her treatment was conservative, Plaintiff contends that this ignores the two times she was referred to orthopedic surgeons. (*Id.*) One surgeon recommended knee injections, "but insurance approval was needed before they could proceed which was not forthcoming." (*Id.*) The other surgeon stated she had a "severe problem," which could not be treated due to her weight. (R 14, PageID.579.) She needed bariatric surgery, but insurance refused to pay for it. (*Id.*)

The ALJ also mishandled Dr. Royal's report that Plaintiff was chronically depressed. (R 14, PageID.580.) The ALJ discounted the opinion because it was vague and lacked specific limitations, yet the Administration never asked for opinions on such limitations. In any case, it would not have been difficult for the ALJ to obtain more exact information from Dr. Royal, Plaintiff observes. (*Id.*)

Finally, Plaintiff argues that the ALJ was incorrect when he concluded that Plaintiff had no intellectual disorder. (R 14, PageID.581.) In school, she was found eligible for special education services, and in twelfth grade her reading and writing were at the third-grade level. (*Id.*) But the ALJ did not incorporate intellectual difficulties in the RFC. (*Id.*)

Defendant's brief begins with the mental limitations, pointing out that no medical opinion supports Plaintiff's argument or contradicts the state agency psychologist's conclusion that Plaintiff could do simple tasks. (R. 15, PageID.598.)[11] Moreover, Plaintiff consistently had normal mental status examinations and attended only "two isolated meetings with counselors in September 2015 and September 2016." (R. 15, PageID.599.) The fact that Plaintiff, while in school, was in special education and tested well below average in reading and writing does not prove she has a diagnosed cognitive impairment, much less any limitations stemming from the impairment. (R. 15, PageID.600.) Next,

---

[11] Defendant's threshold observation is that the ALJ did not need to base the RFC on a medical source opinion. (R. 15, PageID.597, citing *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719 (6th Cir. 2013).) Plaintiff counters by arguing that Defendant erroneously relies on *Rudd*. (R. 16, PageID.614.) In Plaintiff's view, *Rudd* simply says that an RFC does not need to be supported by a medical opinion if other objective evidence supports the RFC. (*Id.*) Here, according to Plaintiff, no such other evidence exists. Neither party seems to dispute that a supporting medical opinion is unnecessary if other objective evidence justifies the RFC. The nub of the present dispute thus centers on the usual question of whether substantial evidence exists and not whether a supporting medical opinion was a prerequisite to fashioning the RFC.

Defendant states that no authority supports Plaintiff's argument that the ALJ should have asked for more specific information from Dr. Royal. (*Id.*)[12]

As for physical limitations, Defendant contends that the ALJ reasonably relied on the opinion of Dr. Sankaran, the medical examiner. (R. 15, PageID.601.) That opinion undercuts Kish's, the only evidence favoring a more restrictive RFC. (*Id.*)[13] The ALJ was not required to discuss all the findings in Dr. Sankaran's report. (R. 15, PageID.602.) Defendant acknowledges that Dr. Sankaran observed some tenderness and decreased range of motion; but the report also stated that Plaintiff's gait was without difficulty, except for a limp, and that "'no significant problem'" was apparent. (*Id.*, quoting R. 11, at PageID.403.) That finding is consistent with Kish's. (*Id.*)

Regarding the cane, Defendant states that Plaintiff is incorrect: the ALJ did consider her cane prescription but reasonably excluded it from the RFC because Dr. Sankaran reported that Plaintiff could walk without the cane (with a limp). (R. 15, PageID.603.)

Defendant also emphasizes Plaintiff's conservative treatment. (R. 15, PageID.603-604.) She met with specialists only twice, and otherwise saw only Kish. (*Id.*) As for

---

[12] Acknowledging that no such authority exists, Plaintiff nonetheless states that her argument is slightly different: "Plaintiff is arguing that it is manifestly unjust for the ALJ to have concerns about Social Security's consultative examiner's report not being detailed enough, to keep those concerns to himself when they could be addressed[,] and then raise the issue for the first time in the decision to give little weight to findings favorable to the Plaintiff." (R. 16, PageID.615.) Further, Plaintiff points out that the ALJ relied on Dr. Newhouse's report—but Dr. Newhouse never examined Plaintiff and instead relied on Dr. Royal's report. (*Id.*) Plaintiff asks how Dr. Newhouse could interpret the report if the ALJ found it too vague. (*Id.*)

[13] Plaintiff replies that the ALJ did not base his decision on Dr. Sankaran's contradiction of Kish. (R. 16, PageID.612-613.) Further, Plaintiff contends that the ALJ and Defendant both misrepresent Dr. Sankaran's findings: he did not opine that Plaintiff could do the various tasks listed in his report *without* restriction. (R. 16, PageID.613.) Given the various limitations Dr. Sankaran observed—such as a limp and inability to squat—Plaintiff interprets his statement that she could do various tasks as meaning that she could do them but only for short periods. (R. 16, PageID.614.)

mentions of other treatments, including injections, Defendant points out that Plaintiff's contention that the injections were denied by insurance is nowhere supported in the record. (R. 15, PageID.604.) The surgeon who suggested bariatric surgery was simply stating that it would help with any possible knee procedures Plaintiff might need in the future, according to Defendant. (R. 15, PageID.604-605.)

Finally, Defendant admits that Plaintiff's argument regarding daily activities has some appeal. (R. 15, PageID.605.) The ALJ might have overemphasized Plaintiff's activity level. (*Id.*) Nonetheless, any error is harmless, in Defendant's opinion, because the ALJ relied on other substantial evidence. (*Id.*)

### b.    Analysis

While the analysis in the first argument is dispositive, Plaintiff's second argument overlaps with the harmless-error analysis in the first. Resolving it, therefore, supports the conclusion I reached above, revealing why a better discussion of Kish's opinion is needed for the ALJ to assemble substantial evidence.

Plaintiff first takes aim at the ALJ's use of her daily activities. Even Defendant admits it's a tempting target. Indeed it is. As I mentioned above, the ALJ suggested that Plaintiff enjoyed a bustling daily routine. (R. 11, PageID.45-48.) But the evidence indicates otherwise, and at the very least is sufficient to force the ALJ to reconsider (along with the error above).

To begin, Plaintiff consistently stated that housework was difficult. (R. 11, PageID.444, 477, 516.) In fact, she obtained a chore provide from the government for help. (R. 11, PageID.84, 395, 402, 516.) The origins of this service are somewhat unclear. There

are no files from it in the record. But Plaintiff made the unremarkable claim that the provider was assigned because she needed help with housework and childcare. Nothing suggests otherwise. This conclusion is supported by a record from Kish in which Plaintiff asked for unspecified assistance with the provider application because she was unable to manage housework. (R. 11, PageID.516.) The provider also helped with Plaintiff's children. (R. 11, PageID.84.) The ALJ did not acknowledge this help when he stated that she can "take care of her children." (R.11, PageID.45, 46.)[14]

Similarly, I am dubious that Plaintiff's prowess with the microwave—her lone instrument for cooking—suggests an independent lifestyle, as the ALJ seemed to think. (R. 11, PageID.46.) The ALJ also failed to grapple with Plaintiff's claims that various limitations hampered her daily activities. For example, she said she struggled with dressing and needed someone to run errands with her. (R. 11, PageID.257, 260.) In short, then, substantial evidence does not support the ALJ's characterization of Plaintiff's daily activities.

Plaintiff also notes that the RFC fails to account for her cane. The ALJ's opinion does not directly analyze the need for a cane, and what it does state is not quite right. Without citation, the ALJ's decision says, "The claimant states that she will sometimes use a cane to assist with ambulation." (R. 11, PageID.47.) But neither Plaintiff's testimony nor

---

[14] The ALJ discussed the daily activities at step 3, then referred to that discussion in the later steps without augmenting or refining it. Thus, for example, the ALJ at step 3 cited Plaintiff's ability to microwave as evidence of only moderate limitations in "adapting or managing oneself." (R. 11, PageID.46.) Perhaps this piece of evidence supports moderate limitations, but it is less clear what work it does at steps 4 and 5. At those Steps, the ALJ propped up his analysis by mere reference to "claimant's daily activities discussed above," with no distinctions among the activities or discussion of how they support the RFC. (R. 11, PageID.48.)

44

her function form suggests that she used the cane only "sometimes." Nor does this limitation appear elsewhere in the record. The only record that indicates she used the cane less than full-time was Dr. Sankaran's, and his report says she used it "most of the time." (R. 11, PageID.401.) In fact, according to his report Plaintiff even used crutches on occasion. (*Id.*)

The ALJ might have surmised that a cane was unnecessary because Dr. Sankaran observed that she could walk with a limp without it. (R. 11, PageID.403.) It is not clear, however, that having to limp around the workplace would allow Plaintiff to maintain significant gainful employment. The ALJ did not address the effect of a limp with the VE or attempt to ascertain how severe the limp was. The ALJ's failure to deal seriously and accurately with the cane is significant because the VE testified that a cane would preclude work. (R. 11, PageID.91.)

The parties next dispute the significance of Dr. Sankaran's report; specifically, the meaning of his conclusion that Plaintiff has "current capabilities" in sitting, standing, bending, and other physical activities. (R. 11, PageID.404.) The ALJ interpreted this to signify that she had "full current capabilities." (R. 11, PageID.48.) The problem with this characterization is that the form Dr. Sankaran used for the opinion presented only a binary choice for each capability—either the Plaintiff could sit ("Yes") or could not ("No"). (R. 11, PageID.404.) The space left for comments was blank. Consequently, the form does not offer an explicit opinion on the degree of Plaintiff's abilities. Thus, it is some evidence that Plaintiff could sit, for example, but it is not very probative of how long she could sit. By stating that the form indicated she had "full" abilities, the ALJ seems to have read too much

45

into the form. Alone, this error likely would not merit remand, but it is more significant considering the other errors noted above.

Next is the ALJ's characterization of Plaintiff's treatment as conservative. (R. 11, PageID.48.) Such a characterization, if accurate, can be used to discredit a claimant or even reject a treating physician opinion. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631, 638-639 (6th Cir. 2016). According to Plaintiff, it was inaccurate to conclude the treatment was conservative because the ALJ ignored the treatments proposed by Dr. Yusaf and Dr. Linehan. Plaintiff is correct that the ALJ did not mention either physician. As noted above, this blindspot allowed the ALJ to disregard Dr. Yusaf's conclusion that Plaintiff's problem was "significant." And it is also true that it also enabled the ALJ to avoid Dr. Yusaf's indication that Plaintiff needed bariatric surgery. A more thorough decision would have addressed these matters, particularly Dr. Yusaf's opinion on the severity of Plaintiff's health, as it directly contradicted Dr. Sankaran's characterization.

But the ALJ was not wrong to label Plaintiff's treatment as conservative. She mentions that injections were ordered to treat the pain. Defendant correctly points out that injection treatments have been considered "conservative." *See, e.g.*, *Boyd v. Comm'r of Soc. Sec.*, No. 9-CV-10329, 2010 WL 1286461, at *7 (E.D. Mich. Feb. 25, 2010). The other treatments Plaintiff received, such as pain medication and a cane, were also properly labeled "conservative." *See, e.g.*, *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 806 (6th Cir. 2011) (characterizing pain medications as conservative treatment).

And it is not clear that Plaintiff even received the injections. Citing to Dr. Linehan's notes, Plaintiff states that she never received the necessary insurance approval for the

injections. (R. 14, PageID.578 (citing R. 11, PageID.425).) But the cited material merely prescribes the injections. It says nothing about the insurer denying the request. Nor do other records. The same is true of Plaintiff's claim that her insurer refused to pay for bariatric surgery. (R. 14, PageID.579.) No evidence from the insurer or the medical providers substantiates this claim. In fact, as Defendant observes, Plaintiff told Kish that she preferred to see a nutritionist rather than have bariatric surgery. (R. 11, PageID.440.) Thus, the ALJ did not err by calling Plaintiff's treatment conservative.

Plaintiff's argument regarding Dr. Royal is also unpersuasive. The ALJ was correct that Dr. Royal's opinion did not contain analysis of specific limitations. (R. 11, PageID.48.) To the extent Plaintiff is arguing that the ALJ should have recontacted Dr. Royal, the relevant regulations, 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (2016), give ALJs discretion on whether to recontact medical sources. *See Hollis v. Comm'r of Soc. Sec.*, No. 13-13054, 2015 WL 357133, at *24 (E.D. Mich. Jan. 27, 2015). Thus, the ALJ was not obliged to recontact Dr. Royal, and I find no error in his failure to do so.

Further, while Plaintiff was diagnosed with depression and sometimes presented with that condition, *see, e.g.*, (R. 11, PageID.365, 395, 466), the notes often indicate that she was not depressed or anxious, *see, e.g.*, (R. 11, PageID.360, 375, 411, 431, 438-439, 447-448, 509.) And even the two mental status assessment she took indicated only mild or moderately severe depression. (R. 11, PageID.375, 477.) Nor did Plaintiff receive much treatment for it. She took antidepressant medication, *see, e.g.*, (R. 11, PageID.516), and only sought counseling twice throughout the duration of the record, (R. 11, PageID.477, 482.) Consequently, I cannot conclude that the ALJ erred in assessing her depression.

47

I would note, however, that the ALJ's decision to credit Dr. Newhouse's assessment of Plaintiff's mental health above Dr. Royal's is not beyond cavil. It is true that the opinions of consulting experts such as Dr. Newhouse who review the evidence can sometimes be given greater weight than those from examining sources. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (citing SSR 96-6p, 1996 WL 374180 (July 2, 1996)). This might be warranted when, for example, the reviewer is a specialist or has access to more information than did the other source. SSR 96-6p, 1996 WL 374180, at *3. Here, there is no indication that Dr. Newhouse is a specialist in mental health; in fact, he appears to be a medical physician, whereas Dr. Royal has a doctorate in psychology. (R. 11, PageID.395.) They both rendered their opinions in May 2015, so it would not seem that Dr. Newhouse could access additional files unavailable to Dr. Royal. Additionally, Dr. Newhouse's explanation relied on a rosy picture of Plaintiff's daily activities. (R. 11, PageID.107 (noting that she cared for her children, shopped, and appeared "independent in personal care").) But as explained above, this ignores evidence that she needed a chore care provider for housework and for help with the children.

Finally, I conclude that the ALJ did not err regarding Plaintiff's intellectual impairments. Evidence of this problem is scarce. The school records from 2003 do indicate possible issues. But those files did not purport to be medical assessments; rather, they were scholastic appraisals intended to determine Plaintiff's educational needs. Consequently, it is not clear that the school's conclusion she had a learning disability equates to a medical diagnosis of her cognitive ability. Even so, to the extent the school records contained objective medical testing, those tests revealed low-average intellectual ability. (R. 11,

PageID.236.) Her difficulties in reading and writing, then, are not clearly related to an underlying impairment. But even supposing they were, the school records are from almost a decade prior to the alleged disability onset date.

The records from within the alleged onset date do not shed much light on this this issue. Notes from Brown, the counselor, mention Plaintiff's intelligence. In 2015, Brown wanted more testing before assessing Plaintiff's intelligence. (R. 11, PageID.480.) A year later, Brown concluded that Plaintiff's intelligence was below average. (R. 11, PageID.484.) It is not apparent that this indicates a cognitive impairment imposing specific limitations. In any event, Brown does not explain the basis for her conclusion or suggest that the additional testing occurred. The rest of the record contains generally normal mental status examinations. *See, e.g.*, (R. 11, PageID.360, 371, 375, 382, 411, 438-439, 447-448.)

In sum, there are enough errors in the ALJ's decision—including his failure to properly analyze Kish's opinion, as discussed in the section above—to warrant remand. The ALJ might again conclude that Plaintiff is not disabled. But he should do so only after proper assessment of Plaintiff's daily activities and the opinions by Kish, Dr. Newhouse, Dr. Sankaran, and Dr. Yusaf.

### 3.      VE Testimony

#### a.      Parties' Arguments

In two brief paragraphs, Plaintiff's last argument is that the VE's testimony was inconsistent with the RFC. (R 14, PageID.582.) The VE testified that the following restrictions would preclude the jobs the ALJ subsequently relied on in his decision: a cane, extra unscheduled breaks, an absenteeism rate of three to four days a month, or the "need

to alternate sitting, standing and walking every 15 minutes in conjunction with limited interaction with the public[.]" (*Id.*) That is all Plaintiff says about this argument.

Defendant responds that Plaintiff's last argument relies on her first two. (R. 15, PageID.606.) Because the ALJ's RFC was accurate, the VE's testimony is valid evidence. (*Id.*)

### b.    Analysis

Plaintiff's final argument merely repackages the earlier contentions for the VE stage. Yet it is a poor fit because she fails to demonstrate that the VE's testimony clashed with the RFC. Had the VE's testimony been premised on a hypothetical that was not reflected in the subsequent RFC, there might be a problem.

But that is not the case Plaintiff makes. Rather, she appears to assert that if the RFC had contained the limitations she favors—such as the use of a cane or a high absenteeism rate—then the VE's testimony would have compelled the ALJ to conclude that no significant number of jobs matched Plaintiff's limitations. This is just another way of saying the RFC was incorrect, a conclusion that depends upon her first two arguments. Thus, the third argument adds nothing of value and does not provide a basis for remand

### H.    Conclusion

For these reasons, I would conclude that substantial evidence does not support the Commissioner's denial of benefits and I recommend **GRANTING** Plaintiff's Motion, (Doc. 14), **DENYING** the Commissioner's Motion, (Doc. 15), and **REMANDING** to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 7, 2019                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 7, 2019                    By s/Kristen Castaneda
                                         Case Manager